UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

---

ADAM YUZUK,

    Plaintiff,

-against-

STEVEN KAHN, JARROD KAHN, EVAN MITTMAN,
SOL KARPMAN, MARK KARPMAN, CIPRIANI
ACCESSORIES, INC., THE MAX LEATHER GROUP,
INC., JMJ REALTY, LLP and KARPMAN &
COMPANY, C.P.A.'s P.C.,

    Defendants.

CIVIL ACTION NO. 05-CV-8802

COMPLAINT

JURY TRIAL DEMANDED

JUDGE KARAS

---

## NATURE OF THE ACTION

1. This action is brought by an individual shareholder, Adam Yuzuk, against his former shareholder-partners, Steven Kahn, Jarrod Kahn and Evan Mittman, the inter-related companies, Cipriani Accessories, Inc. ("Cipriani"), Max Leather, Inc. ("Max Leather") and JMJ Realty, LLP ("JMJ Realty") (together, the "Company"), and the Company's accountants Karpman & Company, C.P.A.'s P.C. ("Karpman & Company"), Sol Karpman and Mark Karpman (together, the "Karpman Defendants"), to recover damages incurred as a result of Defendants' violations of the United States' securities laws, as well as their fraud, aiding and abetting fraud, negligent misrepresentation and unjust enrichment.

2. Prior to September 2003, Yuzuk was a 20% shareholder of Cipriani, with the balance of shares being held at various points by S. Kahn, J. Kahn and Mittman and their families. As described in more detail below, the Defendants engaged in a fraudulent scheme in which they secretly looted money from Cipriani, as a result of which Yuzuk sold back his shares

in Cipriani at an artificially low price and received dramatically reduced shareholder distributions prior to the sale transaction.

3. The Defendants' fraudulent scheme was so widespread that there were at least two and perhaps more different sets of financial books and records for Cipriani and, on information and belief based on facts alleged herein, Max Leather and JMJ Realty.

4. Through a consistent pattern of manipulating and falsifying the books and records of Cipriani, and, on information and belief based on facts alleged herein, Max Leather and JMJ Realty, Defendants knowingly and wrongfully looted millions of dollars from Cipriani for the benefit of Max Leather, another Kahn-Mittman family-owned business in which Yuzuk had no ownership interest, as well as JMJ Realty shareholders S. Kahn, J. Kahn and Mittman, to the detriment of Yuzuk.

5. The Defendants made material misrepresentations and/or omitted to make disclosures of material facts that would have made the representations not misleading, by, among other things, wrongfully providing Yuzuk with false financial information, books and records for Cipriani so that they could purchase Yuzuk's 20% shareholder interest in Cipriani at a greatly reduced price, and under pay him on Cipriani distributions.

6. Under Yuzuk's stewardship as Cipriani's president and 20% shareholder, Cipriani's yearly sales revenues grew from approximately $950,000 in 1995 to over $36 million in 2005. But rather than reward their partner-shareholder Yuzuk for his phenomenal performance in growing the Cipriani business – and S. Kahn's, J. Kahn's and Mittman's personal fortunes – the Defendants systematically conspired to loot millions of dollars from Cipriani, thereby stealing shareholder distributions from Yuzuk and acquiring Yuzuk's 20% stake in Cipriani for a substantially reduced value.

7. From the period on or about January 2001 until Yuzuk sold his interest in Cipriani on September 30, 2003, S. Kahn, J. Kahn, Mittman and the Karpman Defendants conspired to and did wrongfully siphon, unbeknownst to Yuzuk, at least $3 million in profits out of Cipriani and into Max Leather and JMJ Realty.

8. On information and belief based on facts alleged herein, from between 1997, when Yuzuk became a Cipriani shareholder, until in or about January 2001, S. Kahn, J. Kahn, Mittman and the Karpman Defendants conspired to and did wrongfully move millions more of Cipriani's profits to Max Leather and JMJ Realty.

9. In addition, from the period 1997 until September 30, 2003, on information and belief based on the facts alleged herein, S. Kahn, J. Kahn, Mittman and the Karpman Defendants conspired to and did fraudulently overcharge Cipriani for shared inter-company expenses and purchases that Cipriani paid to Max Leather.

10. With regard to the allegations based on information and belief, Plaintiff believes that substantial evidence will be uncovered to support these allegations after a reasonable opportunity for discovery and that many of the facts supporting these allegations are known only to Defendants or are within their control.

## JURISDICTION AND VENUE

11. Jurisdiction is conferred by section 27 of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78aa, and 28 U.S.C. 1331. Claims asserted herein arise under section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the Securities and Exchange Commission, 17 C.F.R. § 240.10b-5.

12. Venue is proper in this District pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. §§ 1391 (b) and 1337. Defendants Cipriani and Max Leather maintain their principal sales showroom and design offices in this district, and Karpman

& Company maintains its principal place of business within this District. Defendants J. Kahn and Mittman maintain their principal residences in this district. All Defendants conduct business within this District and many of the acts giving rise to the wrongdoing complained of herein took place within this District.

13. In connection with acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails and/or interstate telephone communications.

## THE PARTIES

14. Plaintiff Adam Yuzuk is an individual residing at 62 Kings Avenue, Atlantic Beach, New York.

15. Defendant Cipriani is a corporation that maintains its principal place of business at 14-15 Redfern Avenue, Far Rockaway, New York and operates its sales showroom out of offices at 366 Fifth Avenue in Manhattan and its design function out of offices located at 261 West 35th Street in Manhattan.

16. Defendant Max Leather is a corporation that maintains its principal place of business at 14-15 Redfern Avenue, Far Rockaway, New York and operates its sales showroom out of offices at 366 Fifth Avenue in Manhattan and its design function out of offices located at 261 West 35th Street in Manhattan.

17. On information and belief based on facts alleged herein, defendant JMJ Realty is a partnership that maintains its principal place of business at 14-15 Redfern Avenue, Far Rockaway, New York.

18. Defendant Karpman & Company is a corporation that maintains its principal place of business at 225 West 34th Street, New York, New York.

19. Defendant Steven Kahn is an individual residing at 407 Church Avenue, Cedarhurst, New York.

20. Defendant Jarrod Kahn is an individual residing at 181 East 73rd Street, New York, New York.

21. Defendant Evan Mittman is an individual residing at 2 East End Avenue, New York, New York.

22. Sol Karpman is an individual residing in Fort Lee, New Jersey.

23. Mark Karpman is an individual residing Fort Lee, New Jersey.

## FACTUAL BACKGROUND

**A.  The Corporate Defendants**

24. Cipriani is a privately held company that primarily sells men's accessories. Its sole shareholders today are J. Kahn and Mittman.

25. Max Leather, Cipriani's sister company, is a privately held company that primarily sells women's accessories. S. Kahn, J. Kahn and Mittman were, at all relevant times, the sole shareholders of Max Leather.

26. JMJ Realty is a partnership, that, on information and belief, is integrally related to Max Leather and Cipriani and whose partners were, at all relevant times, S. Kahn and Mittman. The name term "JMJ" is derived from the first names of J. Kahn, S. Kahn's son, Marissa Mittman, Mittman's daughter, and Jaymee Kahn, S. Kahn's daughter.

27. On information and belief, JMJ Realty is the legal entity that owns the Factory Facility (defined below) and owns or leases the Company's Manhattan showroom and design offices. On information and belief, JMJ Realty was an integral vehicle through which the Defendants looted Cipriani's profits to reduce the value of Yuzuk's 20% shareholder interest.

28. Yuzuk was never a shareholder or partner in either Max Leather or JMJ Realty.

29. Karpman & Company is a firm of certified public accountants. Karpman & Company served as Cipriani and Max Leather's accountants, and, on information and belief, as JMJ Realty's accountants.

30. The Complaint's allegations on information and belief about JMJ Realty's corporate status, relationship to Cipriani and Max Leather and the Karpman Defendants are based on Yuzuk's ten-year working relationship with S. Kahn, J. Kahn and Mittman, Sol Karpman and Mark Karpman.

**B.    Yuzuk Becomes President and Shareholder of Cipriani**

31. Prior to joining Cipriani, Yuzuk worked as an executive at two leather accessory companies from 1988 through 1994, during which time he developed an excellent reputation in the accessory garment industry.

32. Based on that reputation, in January 1995, S. Kahn hired Yuzuk to serve as Cipriani's president. S. Kahn's charge to Yuzuk as the new president was to improve Cipriani's revenues, which, compared to Max Leather, had been severely underperforming. Cipriani's sales revenues for its fiscal year October 1994 to September 1995 were approximately $950,000.

33. As part of his deal to serve as Cipriani's president, Yuzuk and S. Kahn agreed that if Yuzuk grew Cipriani's yearly sales revenues to $2.25 million in two years, he would be permitted to purchase 20% of Cipriani.

34. As a result of Yuzuk's efforts, Cipriani easily reached the $2.25 million milestone in his first year. Cipriani's sales revenues for its fiscal year October 1995 to

September 1996 were $8.3 million, almost a tenfold increase from the year before Yuzuk became president.

35. On January 1, 1997, Yuzuk and the other Cipriani shareholders entered into an agreement whereby Yuzuk became a 20% shareholder in Cipriani. At the time, the other Cipriani shareholders were Mittman (25%), J. Kahn (20%), Marissa Mittman (Mittman's daughter) (15%); Jaymee Kahn (S. Kahn's daughter) (10%) and S. Kahn (10%).

36. On or about January 29, 2002, Cipriani's shareholder group was reformulated such that Jaymee Kahn's 10% interest was transferred to J. Kahn (increasing his interest to 30%) and Marissa Mittman's interest was transferred to a trust for the benefit of Marissa Mittman.

37. Yuzuk's performance as Cipriani's president was stellar. Under Yuzuk's leadership, Cipriani's yearly sales revenues grew from $950,000, for the fiscal year prior to his joining the company, to a peak of $38 million for the fiscal year October 2001 to September 2002, a forty-fold increase in revenues.

38. In his last full year as president of Cipriani, fiscal year October 2003 to September 2004, Cipriani's yearly sales were over $36 million.

C. **The Fraudulent Scheme From January 2001 to September 2003**

39. As plaintiff learned for the first time earlier this year, beginning not later than at least January 2001, the Defendants systematically siphoned millions of dollars of profits out of Cipriani and into Max Leather and JMJ Realty.

40. Cipriani and Max Leather were run as two sister companies. Yuzuk was president of Cipriani and J. Kahn was president of Max Leather. Yuzuk and J. Kahn operated the sales and showroom functions for their respective companies out of offices located at 366 Fifth Avenue in Manhattan. Mittman operated the design function for both Cipriani and Max

7

Leather out of offices located at 261 West 35th Street in Manhattan. S. Kahn, operated the distribution, accounting, production and purchasing functions for both Cipriani and Max Leather out of the Company's factory facility the ("Factory Facility") located at 14-15 Redfern Avenue, Far Rockaway, Queens, New York.

41. Approximately every three months, the Company's internal accounting department would create a package of financial statements for both Cipriani and Max Leather for the most recently ended three month period. Thus, for example, the three month financial statements for the period ending December 31, 2000, were created by internal accounting in or about early February 2001.

42. Either Sol Karpman or Mark Karpman, or both, of Karpman & Company, the Company's outside accountants, would visit the Factory Facility when the three month financial statements were completed to verify with the Company's internal accounting department that the financial statements and reports were correct.

43. Either Sol Karpman or Mark Karpman, or both, would then meet with S. Kahn at the Factory Facility to review the three month financial statements and reports. It is at this point that S. Kahn and the Karpman Defendants would determine the amount of Cipriani profits that would be shifted to Max Leather and JMJ Realty and a fraudulent second set of Cipriani three month financial statements and reports would be created by S. Kahn and the Karpman Defendants.

44. For example, on or about February 8, 2001, Cipriani's profits were reduced by $300,000 for the three month period ending December 31, 2000. To achieve this result, S. Kahn and the Karpman Defendants would, for example, increase the cost of goods sold in Cipriani's financial statements from $4,704,862 to $5,004,862, thereby reducing profits—and retained earnings for shareholders—by $300,000. As part of that process, a fraudulent set of

8

Cipriani's three month financial statements and reports was created that showed the increased costs and reduced profits.

45. To effect the fraudulent transfer from Cipriani to Max Leather in the above example, a false invoice was created by or at the direction of S. Kahn stating that "Cip pays Max $300,000," with no information describing the purpose of the transfer from Cipriani to Max Leather.

46. A normal invoice from Max Leather to Cipriani gave specific, line-item details describing the purpose and amount of each entry on the invoice down to the last penny.

47. Once the fraudulent invoice from Cipriani to Max Leather was in the system, it was paid out as Cipriani's cash flow permitted. For the purposes of this example, six $50,000 checks signed by S. Kahn against the fraudulent invoice were made from Cipriani to Max Leather over six consecutive weeks, the first on February 12, 2001, the last on March 19, 2001. All of the foregoing occurred without Yuzuk's knowledge at the time it occurred.

48. At about the same time as each fraudulent invoice was created, S. Kahn would hold a meeting at the Factory Facility with Yuzuk, J. Kahn, Mittman and the Sol Karpman or Mark Karpman, or both, during which the fraudulent financial statements and reports for Cipriani, which Yuzuk believed to be accurate, were disseminated and discussed.

49. At these meetings, Yuzuk was repeatedly called to task to explain why Cipriani's net income and profit margins were not higher, despite the greatly increased revenues. Of course, the net income and profit margins would have been higher but for the fraudulent financial books and records and Defendants' fraudulent scheme to loot Cipriani.

50. For example, the fraudulent Cipriani financial statements and reports for the three month period ended December 31, 2000 stated net income of $348,439. Had the financial statements and reports for that period been correctly stated—and had $300,000 of

9

Cipriani's profits not been looted by Defendants—net income for that period would have almost doubled.

51. The Defendants' fraudulent scheme to loot Cipriani for the benefit of the Max Leather and JMJ Realty continued unabated for two and one-half more years until on or about October 27, 2003, when the last known payment of the last known fraudulent "Cip to Max" invoice was paid.

52. During that period, the fraudulent scheme described above repeated itself at least seven times, and probably more. Specifically, additional fraudulent invoices from "Cip to Max" were created on August 8, 2001 for $100,000, August 31, 2001 for $650,000, November 6, 2001 for $700,000, October 31, 2002 for $200,000, April 2, 2003 for $101,000, July 1, 2003 for $275,000 and September 30, 2003 for $650,000.

53. At the very least, these 8 fraudulent invoices, totaling $2,976,000, were paid in full by Cipriani to Max Leather.

54. As testament to Defendants greed and hubris, the final known fraudulent invoice, dated September 30, 2003 for $650,000, was the effective date of the Stock Purchase Agreement whereby Yuzuk sold back his interest in Cipriani. Had the scheme continued past that date, the Defendants would only have been stealing from themselves.

55. In connection with each of these fraudulent invoices, Cipriani's financial statements and reports were falsified by S. Kahn and the Karpman Defendants, and, on information and belief based on Yuzuk's understanding of S. Kahn's relationship with J. Kahn and Mittman, with the knowledge of J. Kahn and Mittman, to reflect lower profits for Cipriani for the respective three-month period.

56. With knowledge of Cipriani's true financial condition, the Karpman Defendants, directly or indirectly, created false Cipriani financial statements and records.

Without the materially false and misleading Cipriani financial statements and records, the fraud alleged herein could not have been perpetrated.

57. In connection with the fraudulent invoices, S. Kahn, J. Kahn, Mittman and the Karpman Defendants conspired to create fraudulent financial books and records for Cipriani to conceal their scheme and manipulate Yuzuk into selling his stake in Cipriani at a greatly reduced value.

58. On information and belief, the Karpman Defendants provided these fraudulent Cipriani financial statements and records to commercial banks to induce those banks to do business with the Company.

59. Notably, Cipriani's profit margins averaged about 15% for the first two years Yuzuk served as president, fiscal years October 1995 to September 1997. Once Yuzuk became a shareholder, however, Cipriani's profit margins—and thus the amount available for shareholder distributions—inexplicably dropped to about 8.4% on average over the next five fiscal years.

60. Adding back only the profits looted from Cipriani described above during the fiscal years October 2000 to September 2003, Cipriani's actual profit margins would have been approximately 13.5% for that period.

61. Based on this systematic pattern of fraud at Yuzuk's expense, and the telltale precipitous decline in Cipriani's profit margins once Yuzuk became a shareholder in January 1997, on information and belief based on the facts alleged above, the Defendants also perpetrated the same scheme of looting Cipriani for the benefit of Max Leather and JMJ Realty from January 1997 through December 2000.

62. On information and belief based on the facts alleged above, prior to January 2001, the Defendants looted Cipriani's profits for the benefit of Max Leather and JMJ

11

Realty, by, among other things, causing Cipriani to pay Max Leather invoices for inventory that was sold by the Company's vendors to Max Leather.

63. Moreover, based on the same systematic looting of Cipriani's profits by Defendants during the period Yuzuk was a shareholder, on information and belief based on the facts alleged above and Yuzuk's ten years working as Cipriani's president, many of the inter company payments by Cipriani to Max, (i) for shared expenses, such as general and administrative costs, and (ii) purchases by Cipriani from Max, for inventory and other items, are believed to have been fraudulently overcharged to Cipriani.

64. In addition, there is reasonable basis to believe that S. Kahn, J. Kahn and Mittman misused Cipriani corporate credit cards to make personal expenditures, without reimbursing Cipriani.

65. J. Kahn, is S. Kahn's son, Mittman has been S. Kahn's partner for over thirty years and Mittman's sister Peggy is S. Kahn's wife. Based of these close personal and familial relationships, J. Kahn and Mittman enjoyed significant personal contact and familiarity with each other and S. Kahn and were advised of or had access to information about Cipriani's true financial performance.

66. In addition, as senior executives and shareholders and/or partners of Cipriani, Max Leather and JMJ Realty, J. Kahn and Mittman benefited directly from the fraudulent scheme. By virtue of their positions in the Company, J. Kahn and Mittman were privy to and/or participated in the looting of Cipriani and the creation of Cipriani's false financial statements and reports.

67. Despite knowledge of Cipriani's true financial condition, J. Kahn and Mittman failed to disclose to Yuzuk, their shareholder-partner to whom they owed a duty of utmost loyalty and good faith, that the Cipriani financial statements and records were materially

12

false and misleading. Without the materially false and misleading Cipriani financial statements and records, the fraud alleged herein could not have been perpetrated.

68.  During the same period that the Karpman Defendants were directly participating in the fraudulent scheme to loot Cipriani and create false financial statements and reports to mislead Yuzuk, the Karpman Defendants also acted as Yuzuk's personal accountant and advisor and helped prepare his tax returns.

### D.  Yuzuk Sells His Interest in Cipriani

69.  The Defendants knowingly and wrongfully manipulated Yuzuk by using the false and misleading financial books and records to misrepresent Cipriani's true financial performance.

70.  Yuzuk came under constant pressure to improve the performance of the company, even though, unbeknownst to Yuzuk, Cipriani was performing as well as it had been when he was president, but before he became a shareholder.

71.  Cipriani's false financial books and records were integral to Defendants scheme to loot Cipriani and, ultimately, were the basis for Yuzuk selling his 20% shareholder interest in the Company for less than its real value.

72.  The Defendants' plan to loot Cipriani and manipulate its books and records, and thus reduce its performance on paper, ultimately gave S. Kahn the leverage he needed to reduce Yuzuk's control over the company. Accordingly, in or about March 2002, S. Kahn gave his son J. Kahn effective control over Cipriani's day to day operations.

73.  Faced with no longer running the company he grew from $950,000 to over $38 million in revenues in eight years, Yuzuk decided to sell his interest in Cipriani.